## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ZOE USA HOLDINGS, INC. et al.[1] | : | Case No. 14-12452 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |

**DEBTORS' [PROPOSED] FIRST AMENDED JOINT DISCLOSURE STATEMENT**

BLANK ROME LLP
John E. Lucian (*pro hac vice*)
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103
(215) 569-5500

and

Josef W. Mintz (DE No. 5644)
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400

*Counsel for the Debtors*

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN.  THE DEBTORS BELIEVE THAT THIS PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE DEBTORS URGE VOTERS TO ACCEPT THE PLAN.**

Dated:  January 29, 2015

---

[1]  The Debtors and the last four digits of their respective tax identification numbers are:  Zoe USA Holdings, Inc., a Delaware corporation (1964); MKEL Holdings LLC, a Delaware limited liability company (1104); Zoe Hotels, Inc., a New York corporation (9974); and Zoe Lodging, Inc., a Delaware corporation (3428).

## TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION .................................................................................................1

    A.    Purpose of This Document............................................................1

    B.    Confirmation Procedures ..............................................................3

II. BACKGROUND ...............................................................................................5

    A.    Description and History of Debtors' Business............................5

    B.    Debtors' corporate structure: ......................................................6

    C.    UK Insolvency Proceedings of Debtors' Parent Entities.............7

    D.    Tax issues.....................................................................................8

    E.    Environmental issues ...................................................................8

    F.    Debtors' Bankruptcy Filing .........................................................8

III. SUMMARY OF THE PLAN OF LIQUIDATION ........................................9

    A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan ........................................................................9

    B.    Classification of Claims...............................................................9

    C.    Administrative Expenses and Fees ............................................10

    D.    Court Approval of Professional Compensation Required ..................................10

    E.    Priority Claims...........................................................................11

    F.    Class of General Unsecured Claims ..........................................11

    G.    Class of Interest Holders............................................................11

    H.    Treatment of Claims under the Plan ..........................................12

    I.    Administrative Claims and Fee Expenses..................................12

    J.    Means of Effectuating the Plan..................................................13

    K.    Disbursements to Claimants ......................................................13

i

L.      Releases by Recipients of Distributions .................................................13

M.      Other Provisions of the Plan ...................................................................14

N.      Tax Consequences of Plan .......................................................................15

O.      Risk Factors .............................................................................................16

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ...............................17

A.      Who May Vote or Object .........................................................................17

B.      Liquidation Analysis ...............................................................................20

V. CONCLUSION ................................................................................................21

143353.01600/22366654v.1

# I.

# INTRODUCTION[2]

Chapter 11 of the United States Bankruptcy Code (the "Code") sets forth procedures for the filing and confirmation of a chapter 11 plan of reorganization or liquidation.  A plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  This plan of liquidation (the "Plan") is being proposed by Debtors, Zoe USA Holdings, Inc., Zoe Hotels. Inc., Zoe Lodging, Inc. and MKEL Holdings, LLC (collectively, "Debtors").  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN THAT IS ANNEXED HERETO AS EXHIBIT B.

The Debtors are proposing a substantively consolidating liquidating plan.  In other words, the Plan proposes to pool the assets and liabilities of the Debtors into a single estate and to resolve claims, if appropriately due and owning, by making payments from a single fund of Debtors' aggregate cash on hand.  Debtors are no longer operating as a going concern.  The payments will occur after reconciliation of all claims.

A.    **Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)    WHO CAN VOTE OR OBJECT,

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the accompanying Plan of Liquidation.

(2)     **THE PROPOSED TREATMENT OF YOUR CLAIM (I.E., WHAT YOUR CLAIM WILL RECEIVE IF THE PLAN IS CONFIRMED),**

(3)     **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

(4)     **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

(5)     **THE EFFECT OF CONFIRMATION, AND**

(6)     **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Section 1125 of the Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

**Pursuant to the Bankruptcy Code, the Plan and Disclosure Statement were filed on the Petition Date (defined below). The Debtors have neither sought nor obtained any order of the Bankruptcy Court determining that this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. Nevertheless, in the interest of conserving the assets of the Debtor's estate, the Bankruptcy Court has approved a procedure whereby the adequacy of this Disclosure Statement shall be considered**

2

**simultaneously with the Debtors' request to confirm the Plan.  The Debtors believe, but do not warrant, that this Disclosure Statement contains "adequate information." The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).**

This Disclosure Statement is provided to each creditor whose claim has been scheduled by Debtors or who has filed a proof of claim against Debtors and to each interest holder of record as of the date of approval of this Disclosure Statement.  Under the Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

> **B.**     **Confirmation Procedures**
>
> <u>Persons Potentially Eligible to Vote on the Plan</u>

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by Debtors as undisputed, non-contingent and unliquidated or who, prior to the hearing on confirmation of the Plan, has filed with the Court a timely proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan.  The Ballot Form that you received does not constitute a proof of claim.  If you are uncertain whether you filed a proof of claim, you should check the claims register maintained at the Office of the Clerk of the Bankruptcy Court located at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801, or by accessing the Court's website at <u>www.deb.uscourts.gov</u>, as well as the terms of the Plan.  The Clerk of the Bankruptcy Court will not provide this information by telephone.

3

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN
THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE
NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE
PLAN, THEN THE PLAN WILL BE BINDING ON DEBTORS AND ON ALL CREDITORS
AND INTEREST HOLDERS IN THESE CASES.

1.      Time and Place of the Confirmation Hearing

The hearing at which the Court will determine whether to approve this
Disclosure Statement and confirm the Plan will take place on _____, **2014** at the United
States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware
19801.

2.      Deadline for Voting for or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the
enclosed ballot and return the ballot in the enclosed envelope to counsel for Debtors:

> **John Lucian, Esquire**
> **BLANK ROME LLP**
> **One Logan Square**
> **130 N. 18th Street**
> **Philadelphia, PA 19103.**

Your ballot must be received by _____, **2014** or it will not be
counted.

3.      Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court
and served upon counsel for Debtors at the address listed above by ____, **2014.**

4.      Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should
contact John Lucian, Esquire, whose name and address appear above.

4

## II.

## BACKGROUND

A.    **Description and History of Debtors' Business**

Debtors were formed in the late 20th century to own, operate and/or manage hotels under the Le Meridien brand, as well as related real estate and/or hotel industry pursuits.  At its peak, the business enterprise consisted of approximately forty affiliated North American entities with diverse holdings and operations within the hotel and real estate industry.  In addition to operating hotels, the business enterprise included regional sales, marketing and franchising offices in New York and Chicago, including a subsidiary under the name Meridien LeGuest Book that held the Le Meridien franchise rights for its North American hotels.  These entities were part of a global business enterprise with international hotel operations under the Le Meridien brand.

In late 2005, due to global economic contraction and financial pressures of Debtors' ultimate parent entity in the United Kingdom that was in the midst of insolvency proceedings there, Debtors decided to sell the hotels and related businesses in North America.  These sales included separate transactions for three Le Meridien hotels in North America and the omnibus sale of the franchise rights, all of which closed by the end of 2005.  The three separate hotels were located in Beverly Hills, CA, Chicago, IL and Toronto, Canada, respectively.  Debtors also were operating various non-owned hotels in the United States under various license, franchise and leasing arrangements.

By November 2005, Debtors had sold these hotels in arms-length transactions for an aggregate purchase price of approximately $172 million, and ceased operating non-owned hotels.  The sale proceeds were used primarily to satisfy secured debt owing to Lehman Bros. in

5

the approximate amount of $130 million.  Since then, Debtors have neither owned nor operated any hotels or related businesses.

Debtors were unable to dissolve after the sales closed because of various litigation matters in the U.S. and Canada that remained unresolved.  One such matter involved litigation over hotel management contracts with owners of franchised Le Meridien hotels in Texas and Louisiana.  These hotels were managed and operated but not owned by Meridien.  The litigation settled in 2008 and Debtors have fully performed all obligations under the settlement.

Another complex litigation matter involving Debtors was pending in Canada for many years.  Although Debtors disputed any liability, they maintained a $2 million litigation reserve while the case remained pending.  The Canadian case was resolved in 2012, thereby permitting Debtors to complete the wind-down of the business affairs of the Canadian entity (MKEL Amalco, Inc.) in mid-2013.  Approximately $2 million was disbursed to Zoe Hotels, Inc. as a part of the Canadian wind-down.  Those funds were paid to IDF and ZAC I entities (defined below) in November 2013 in partial satisfaction of operating loans due to them, as discussed below.

B.    **Debtors' corporate structure:**

MKEL Holdings, LLC is a Delaware limited liability company formed in 2009. MKEL is a wholly-owned subsidiary of Zoe Lodging, Inc.

Zoe USA Holdings, Inc. is a Delaware corporation formed in 2001 and is a wholly-owned subsidiary of Zoe Hotels, Inc.

Zoe Lodging. Inc. is a Delaware corporation formed in 1985.  It is also a wholly owned subsidiary of Zoe Hotels, Inc.

Zoe Hotels, Inc. is a NY corporation formed in 1974.  It is a wholly-owned subsidiary of ZAC I (defined below) and an indirect, wholly-owned subsidiary of Newgate

6

Capital Limited, a foreign entity organized under the laws of the United Kingdom that has been in an insolvency proceeding under British law since approximately April, 2003.

### C.   UK Insolvency Proceedings of Debtors' Parent Entities

Debtors are in default on operating loans to two international affiliates: IDF Hotels & Resorts Limited (in liquidation) ("IDF") and Zoe Acquisition Company I Limited (in liquidation) ("ZAC I").  Neither IDF nor ZAC I is operational; rather, both are the subject of formal liquidation proceedings in London, England pursuant to the Insolvency Act of 1986 (British law).  The Court-appointed liquidator is C.J. Hughes in London, England (the "UK Liquidator").

Debtors have attempted to repay these loans and have made various repayments over the years but, despite their efforts, have been unable to satisfy the loans in full.  Most recently, Debtors made payments of $3,000,000 in November 2012 and $2,800,000 in November 2013.  (The 2013 payment was inclusive of the MKEL Amalco funds referenced above). However, significant amounts remain due and Debtors are unable to satisfy them out of their remaining assets.

Based on the most recent demands received from the UK Liquidator, copies of which are attached hereto as "**Exhibit A**", Debtors owe $2,371,039.48 to IDF and $1,041,037.91 to ZAC, respectively, for unsecured loans each made to Zoe Hotels, Inc.  These loans were made in or around 2003 in the approximate amounts of $96,000,000 from IDF and $30,000,000 from ZAC I, respectively, and were paid down substantially in 2005 with the North American hotel sale proceeds.  The UK Liquidator is seeking to close those proceedings and has threatened to take legal action to enforce its rights in the United Kingdom.  Accordingly, Debtors have filed bankruptcy, in part, to avoid the costs and risks of defending litigation in a foreign country.

7

**D.**    **Tax issues**

Debtors are current on their tax returns and payments due thereon to the Internal Revenue Service and any state or local taxing authorities.  Debtors do not believe they owe any additional amounts but, in an abundance of caution, Debtors sought a determination under Section 505 of the Bankruptcy Code.  On January 5, 2015, the Court entered its *Order Granting Debtors' Motion For Declaratory Relief Pursuant to 11 U.S.C. §§ 105(a) and 505(a)(1)* [Dkt No. 34] in which the Court held that the Debtors have fully and timely paid their federal taxes for all of the tax years ended June 30, 2010 through January 31, 2013 and should not be subject to additional federal income tax liability or penalties.

**E.**    **Environmental issues**

Debtors are not aware of any current environmental liabilities.  However, as former owners of commercial real property sites where hotels were operated, Debtors provided notice of these bankruptcy cases to the appropriate environmental agencies should such agencies desire to investigate whether any liabilities exist.

**F.**    **Debtors' Bankruptcy Filing**

On October 31, 2014, (the "Petition Date") Debtors each filed a voluntary petition under chapter 11 of Title 11 of the U.S. Code., pursuant to authorizations by their sole remaining director, James Shinehouse.  Through chapter 11, Debtors seek to liquidate their assets and make distributions to their creditors and/or interest holders, as applicable, in accordance with the proposed joint chapter 11 plan of liquidation summarized below.

**G.**    **Bar Dates**

On January 5, 2015, the Court entered its *Order (A) Fixing the Procedures and Deadlines to File Proofs of Claim Pursuant to Fed. R. Bankr. P. 2002 and 3003 and Del. Bankr. L.R. 2002-1(E) and (B) Approving the Form and Manner of Notice of Bar Date* [Dkt. No. 35]

8

(the "Bar Date Order").  As set forth more fully in the Bar Date Order, holders of prepetition

claims that are not Governmental Units (as defined in the Bar Date Order) must file their claims

so that they are actually received by the clerk of the Court on or before March 10, 2015.

Governmental Units holding prepetition claims must file their claims so that they are actually

received by the clerk of the Court on or before April 29, 2015.

**III.**

**SUMMARY OF THE PLAN OF LIQUIDATION**

A.     **What Creditors and Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies claims and interests into various classes.  The Plan states

whether each class of claims or interests is impaired or unimpaired.  The Plan provides the

treatment each class will receive.  As required by the Bankruptcy Code, all post-petition

administrative expense claims, professional fees and priority tax claims are treated separately

and have not been placed into a class; however, those claims have priority over certain other

claims.

B.     **Classification of Claims**

The allowed claims against the Estate are classified as follows under the Plan:

1.     Class I:  This class consists of any secured claims.  Debtors do not have

any secured claims.

2.     Class II:  This class consists of general unsecured, nonpriority claims.

3.     Class III:  This class consists of the equity interests in the Debtors.  These

interests are held ultimately by the UK Liquidator.

Creditors and equity holders are required to have their claims and interests

classified in various groups so that all creditors holding particular types of claims or interests

receive the same treatment for their respective class of claims or interests.

9

C.      **Administrative Expenses and Fees**

Administrative expenses are claims for fees, costs or expenses of administering

Debtors' chapter 11 cases that are allowed under Section 507(a)(1) of the Code and include all

professional compensation requests pursuant to Sections 330 and 331 of the Code.  The Code

requires that all administrative expenses including fees payable to the Court and the Office of the

United States Trustee that were incurred during the pendency of the case must be paid on the

Effective Date[3] of the Plan, unless a particular claimant agrees to a different treatment.

D.      **Court Approval of Professional Compensation Required**

Pursuant to the Code, the Court must rule on all professional compensation and

expenses listed before the compensation and expenses will be owed.  The professional in

question must file and serve a properly noticed fee application for compensation and

reimbursement of expenses, and the Court must rule on the application.  Only the amount of

compensation and reimbursement of expenses allowed by the Court will be owed and required to

be paid under this Plan as an administrative claim.

Each professional person who asserts an administrative claim that accrues before

the confirmation date shall file with the Court, and serve on all parties required to receive notice,

an application for compensation and reimbursement of expenses prior to the Effective Date of

the Plan.  Failure to file such an application timely shall result in the professional person's claim

being forever barred and discharged.  Each and every other person asserting an administrative

claim shall be entitled to file an administrative proof of claim prior to the confirmation hearing

on the Plan, or such administrative claim shall be deemed forever barred and discharged.  No

---

[3] Capitalized terms not defined herein shall have the meaning ascribed to them in the attached Plan.

143353.01600/22366654v.1

motion or application is required to fix the fees payable to the Clerk's Office or Office of the

United States Trustee. Such fees are determined by statute.

As indicated above, Debtors will need to pay the full amount of administrative

claims and fees on the Effective Date of the Plan unless (a) a claimant has agreed to different

treatment or (b) the Court has not yet ruled on the administrative claim.

### E.    Priority Claims

Certain priority claims that are referred to in Sections 507(a)(3), (4), (5), (6), and

(7) of the Code are required to be placed in a separate class from the general unsecured claims.

These types of claims are entitled to certain priority treatment. The Code requires that each

holder of such a claim receive cash on the Effective Date equal to the allowed amount of such

claim. A class of unsecured priority claim holders may vote to accept deferred cash payments of

a value, as of the Effective Date, equal to the allowed amount of such claims. However, Debtors

are not aware of any such priority claims in these chapter 11 cases.

Priority tax claims are certain unsecured income, employment and other taxes

described by Section 507(a)(8) of the Code, which requires that each holder of such a priority tax

claim receive the present value of such claim according to terms no less favorable than those

offered to creditors of a lower priority. Priority tax claims are not classified. Debtors believe

they have paid all outstanding taxes and are not aware of any such priority tax claims.

### F.    Class of General Unsecured Claims

General unsecured claims are uncollateralized claims and are not entitled to any

priority under Section 507(a) of the Code.

### G.    Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity

interest) in Debtor Zoe Hotels, Inc.

11

H.    **Treatment of Claims under the Plan**

The Plan proposes that creditors receive the following treatment on their

respective claims:

I.    **Administrative Claims and Fee Expenses**

Each holder of an Administrative Claim (including Priority Tax Claims and Fee

Expenses) is to be paid on the Effective Date or as soon as is reasonably practicable thereafter,

unless such other terms are agreed between the respective administrative claimant and Debtors as

provided for in the Code.  Included in this class is any administrative expense claim for legal fees

due to Debtors' counsel, Blank Rome LLP.  All professionals shall be required to file a Fee

Application prior to the Effective Date and shall not be entitled to a Plan Distribution until

obtaining a final, non-appealable order from the Court allowing and awarding such fees.

Included also in this class is any payment obligations to the United States Trustee Program for

any applicable and outstanding quarterly fees.

(a)    Class I –Secured Claims:  As stated above, Debtors do not believe there

are any secured claims.  However, to the extent that there are any secured claims, as soon as

practicable after the Effective Date of the Plan, the holder of an allowed secured claim shall

receive in full satisfaction thereof, at the option of Debtors:  (a) the net proceeds of the sale of the

collateral securing such claim, up to the amount of the allowed claim of such holder; (b) the

return of the collateral securing such claim; or (c) cash equal to the value of the collateral

securing such claim, up to the amount of the allowed claim of such holder.

Class II – Unsecured Creditors:  Unsecured creditors shall receive a pro-rata

distribution of any amounts remaining after satisfaction of the claims in Class I.  Debtors

anticipate making such distributions within 30 days after the Effective Date of the Plan, if not

sooner.

Class III - Equity Interests:  To the extent there are any amounts remaining after satisfaction of the claims in Classes I and II, such amounts shall be distributed pro-rata to the holders of equity interests.  To the extent there are no amounts remaining after satisfaction of the claims in Classes I and II, then all equity interests shall be deemed canceled and extinguished and of no further force or effect.

## J.        Means of Effectuating the Plan

As of the Petition Date, Debtors' cash on hand approximated $1.1 million.  This cash shall be used to fund the Plan and effectuate its terms.

## K.        Disbursements to Claimants

Debtors shall make the distributions to creditors in accordance with the terms of the Plan and the timeframes contained therein.  Debtors anticipate completing all disbursements and winding up the estate within 90 days after the Effective Date of the Plan.

## L.        Releases by Recipients of Distributions

Except as otherwise expressly set forth in the Plan or Confirmation Order, each and every entity receiving a distribution pursuant to this Plan on account of its Allowed Claim shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, and liabilities in connection with or related to Debtors or this Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, that are based in whole or in part on any act, omission, or other occurrence taking place on or prior to the Effective Date, against Debtors' current and former officers, directors, and professionals to the fullest extent permitted under applicable law.  Notwithstanding anything in this Plan or in the releases set forth above to the contrary, nothing herein shall be construed to release, and Debtors do not hereby release, any of their rights: (1) to enforce this Plan and any contracts, instruments, releases, indentures, and

13

other agreements or documents delivered thereunder; (2) to litigate Disputed Claims, including without limitation to make any Claim, or demand or allege and prosecute any cause of action against any holder of any Disputed Claims; and (3) to litigate Claims and causes of action not specifically released herein.

### M.    Other Provisions of the Plan

1.    Executory Contracts and Unexpired Leases

The Plan provides that all Executory Contracts and Unexpired Leases shall be deemed rejected.  (Debtors are not aware of any such contracts or leases).  All proofs of claim with respect to claims arising from said rejection must be filed with the Court within the earlier of (i) the date set forth for filing claims in any order of the Court approving such rejection or (ii) fifteen (15) days after the Confirmation Date.  Any such rejection damages claims, proofs of which are not filed timely, will be barred forever from assertion.

2.    Retention of Jurisdiction

The Court will retain jurisdiction as provided in the Plan.

3.    Procedures for Resolving Contested Claims

All creditors and parties in interest shall be entitled to object to the allowance of claims (whether scheduled or asserted in a proof of claim) prior to the Confirmation Date.

4.    Effective Date

The Plan will become effective on the Effective Date as defined in the Plan.

5.    Modification

14

Debtors, as plan proponent, may alter, amend or modify the Plan at any time prior to the Confirmation Date, and thereafter, as provided in Section 1127(b) of the Code and in accordance with the terms of the Plan.

N.      **Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present.  Debtors CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the U.S. Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The tax consequences of the Plan to the holder of a claim will depend, in part, on the nature of the claim, the type of consideration received in exchange for the claim, whether the holder is a resident of the United States for tax purposes, whether the holder reports income on an accrual or cash basis method, and whether the holder receives distribution(s) under the Plan in one or more taxable years.  Holders of claims are strongly advised to consult their tax advisors with respect to the tax treatment of their particular claims under the Plan.  Holders of claims which do not constitute tax securities should generally recognize gain or loss to the extent the amount realized under the Plan in respect of their claim exceeds, or is exceeded by, the respective tax basis of the claim.  The amount realized for this purpose will generally equal the sum of cash or the fair market value of any consideration received under the Plan and with respect to their claim.  The amount realized with respect to any debt obligation received by an accrual based taxpayer, however, should generally equal the obligation's principal amount, as

15

determined for tax purposes.  Any gain or loss recognized on the exchange will be capital or

ordinary, depending on the status of the claim in the holder's hands.  The holder's aggregate tax

basis for any consideration received under the Plan will generally equal the amount realized.

The holding period for any consideration received under the Plan will generally begin on the day

following the receipt of such consideration.

The foregoing is intended only as a summary of certain federal income tax

consequences of the Plan and is not a substitute for tax planning with a tax professional.  The

above discussion is for informational purposes only and is not tax advice.

TAX CONSEQUENCES IN MANY CASES ARE UNCERTAIN AND MAY

VARY DEPENDING ON THE HOLDER'S INDIVIDUAL CIRCUMSTANCES.

ACCORDINGLY, HOLDERS OF ANY CLAIMS OR INTEREST ARE URGED TO

CONSULT WITH THEIR TAX ADVISERS ABOUT THE FEDERAL, STATE, LOCAL AND

FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, OR ANY

DISTRIBUTION YOU MAY RECEIVE UNDER THIS PLAN.

NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH

RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN, AND NO TAX OPINION IS

GIVEN OR AUTHORIZED BY THIS DISCLOSURE STATEMENT.  NO RULING OR

DETERMINATIONS OF THE INTERNAL REVENUE SERVICE OR OF ANY TAXING

AUTHORITY HAS BEEN OBTAINED OR SOUGHT WITH RESPECT TO THE PLAN AND

THE ABOVE DESCRIPTION IS NOT BINDING UPON THE INTERNAL REVENUE

SERVICE OR ANY OTHER TAXING AUTHORITY.

O.    **Risk Factors**

Debtors are not aware of any significant risk factors attendant upon the

consummation of the Plan because the Plan will be funded from cash on hand and is not

conditioned upon a sale of assets, resolution of litigation or other contingent factors. Debtors, as plan proponents, believe that the Plan is viable and will meet all requirements of confirmation. However, you are encouraged to conduct your own analysis and evaluation of the Plan and Disclosure Statement in their entirety, and in consultation with your own advisors.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS AND ADVISORS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, that creditors or interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and that the Plan is feasible. These requirements are not the only requirements for confirmation.

### A.   Who May Vote or Object

1.   Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but not everyone is entitled to vote to accept or reject the Plan.

2.   Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

(a)    What is an Allowed Claim/Interest

A creditor or interest holder must first have an allowed claim or interest to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after noticing and hearing, either overrules the objection or allows the claim or interest for voting purposes.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on Debtors' Schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

(b)    What is an Impaired Claim/Interest

An allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their claim plus interest.

Under the Plan, Class II is impaired and holders of claims in Class II are entitled to vote to accept or reject the Plan.  Parties who dispute Debtors' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan.

3.    Who is Not Entitled to Vote

18

The following four types of claims are not entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Sections 507(a)(1),(a)(2), and (a)(8) of the Code; and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Section 507(a)(1), (a)(2) and (a)(7) of the Code are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.   EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

4.      Who Can Vote in More than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured portion of the claim and another ballot for the unsecured deficiency claim. The same is true should a creditor hold different claims in any other classes.

5.      Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes.

6.      Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the voted allowed

19

claims of such class voted in favor of the Plan.  A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the voted allowed interest-holders of such class voted in favor of the Plan.

       7.        <u>Treatment of Nonaccepting Classes</u>

       Even if all impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) of the Code and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

       8.        <u>Request for Confirmation Despite Nonacceptance by Impaired  Classes</u>

       Debtors ask the Court to confirm this Plan by "cramdown" on impaired classes if any of these classes do not vote to accept the Plan.

       **B.**        **<u>Liquidation Analysis</u>**

       Another confirmation requirement is the best interest of creditors test, which requires a liquidation analysis.  Under this test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if Debtors were liquidated under chapter 7 of the Bankruptcy Code.

       Debtors believe that nonpriority general unsecured creditors would receive less if these cases were converted to chapter 7 and liquidated thereunder because the additional layer of

143353.01600/22366654v.1

chapter 7 administrative costs would further reduce the amount available for distributions to general unsecured creditors.  Further, a conversion to chapter 7 would delay the date of distribution thereby impacting the net present value of the distribution.  Accordingly, the Plan satisfies the best interest of creditors test because creditors will receive at least as much under this Plan as they would receive in a chapter 7 liquidation.

## V.

### CONCLUSION

**DEBTORS URGE ALL HOLDERS OF IMPAIRED CLAIMS AND INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS PRIOR TO THE DEADLINE REFERENCED ON THE BALLOT.**

*/s/ James Shinehouse, President*

143353.01600/22366654v.1